**In the Interest of Kaylee Lynn–Marie BRILLIANT, A Child.**

No. 08–01–00054–CV.

Court of Appeals of Texas, El Paso.

June 20, 2002.

682

John P. Mobbs, Beck & Given, El Paso, for appellant.

Keith C. Gorman, El Paso, for appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

This appeal centers on the recently adopted Uniform Child Custody Jurisdiction and Enforcement Act. Mother, father, and child are former residents of Massachusetts, all of whom relocated to Texas. When the mother expressed her intent to return to Massachusetts, the father filed suit and obtained a temporary restraining order prohibiting the removal of the child from the jurisdiction of the court. Al-

though she was duly served, the mother left Texas with the child and returned to Massachusetts, later claiming that her relocation to Texas was merely a temporary absence. The trial court denied the mother's plea to the jurisdiction and subsequently entered a default judgment naming the father as sole managing conservator. We conclude that Texas has jurisdiction under the UCCJEA, but we reverse the default judgment and remand for a trial on the merits.

## FACTUAL SUMMARY

Kaylee Lynn–Marie Brilliant was born in Massachusetts on June 15, 1999. She was conceived when her mother, Kristen Lynn Fox (Kristen), was a seventeen-year-old high school student. Reginald Brilliant (Regi) is Kaylee's father but he and Kristen have never married. Kristen moved in with Regi in March 1999 and they continued living together until April 16, 2000, when Regi moved to Texas. Regi grew up in El Paso and his family continued to live here. The record reveals that the couple had planned to relocate to El Paso and Regi, an employee of Home Depot, requested a job transfer. When the transfer came through, Regi loaded a U–Haul truck with all of his new family's belongings, except for the clothing Kristen needed to finish the last two months of high school. During their brief separation, Kristen lived with her mother and wrote letters in which she told Regi she was anxious "to start my new life down there with you." As planned, Kristen and Kaylee arrived in El Paso on June 12.

On June 15, 2000, Kristen completed and signed a rental application adding her name to the lease on their apartment. She filled out job applications with Blockbuster and Payless ShoeSource, although neither of these is signed nor dated. Kaylee's immunization records were transferred to

an El Paso clinic and Regi discovered that the child's shots had not been kept current. While the record does not indicate when the parties applied for a social security card in Kaylee's name, the Social Security Administration mailed Kaylee's card—postmarked April 1, 2000—to Regi's father's home in El Paso.

Kristen soon expressed displeasure with Texas. She wrote Regi a letter on July 10, telling him "that it just wasn't working out, she was leaving, she and the baby were going back to Massachusetts." Regi filed suit on July 19 and on July 21, he obtained a temporary restraining order preventing Kristen from removing Kaylee from El Paso County. Kristen was served with the restraining order on July 22 but she did not move out of the couple's apartment until July 24, when her mother arrived in town. Kristen and Kaylee stayed in the motel with Kristen's mother until July 27, when all three of them left El Paso for Massachusetts in violation of the restraining order. Kristen and Kaylee spent a total of forty-five days in Texas.

Kristen filed a paternity suit in Massachusetts on August 3. She did not file an answer in the Texas suit but instead filed a plea to the jurisdiction on August 7. On August 16, she filed an amended plea to the jurisdiction to which she attached her own affidavit and a certified copy of a letter from the Massachusetts court to the associate judge of the El Paso court. A hearing on the plea proceeded before the associate judge on August 9 and Kristen appealed the adverse ruling to the referring court. The *de novo* hearing before the Honorable Alfredo Chavez took place on August 18. Kristen did not appear for the hearing. Judge Chavez ultimately denied the plea. On October 26, Kristen, represented by new counsel, urged a motion for new trial and, in the alternative, a motion for reconsideration. Again, Kris-

ten did not appear. In denying the relief requested, the trial court stated:

> It's this Court's opinion that Texas had jurisdiction over the case at that time. To grant the new trial and to decline jurisdiction, even on an inconvenient forum basis would be to condone the blatant disregard for court orders by the respondent, which highly disturbs this Court. And I'm not going to do that.

The following day, Regi and his attorney appeared before Judge Chavez. They advised the court that the two attorneys who had represented Kristen had been employed solely for the purpose of pursuing the plea to the jurisdiction and Kristen, having failed to file an answer, was in default. Regi's counsel also represented that she had advised Kristen's attorney following the hearing on the motion for new trial that she intended to pursue a default judgment the next day. Neither counsel nor Kristen appeared. The court found that it had jurisdiction of the cause and of the parties, that all persons entitled to citation were properly cited, that a jury was waived, and that a record was taken. He appointed Regi as sole managing conservator of Kaylee, appointed Kristen as possessory conservator and entered a standard possession order. Child support was fixed at $150 per month. From this order, Kristen brings two issues for review: (1) Texas lacked subject matter jurisdiction to make an initial child custody determination under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA); and (2) the default judgment was improper because Kristen did not receive forty-five days' notice of the trial setting.

## STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea by which a party contests the trial court's authority to determine the subject matter of the cause of action. *See,*

*e.g., State v. Benavides,* 772 S.W.2d 271, 273 (Tex.App.-Corpus Christi 1989, writ denied). The petitioner has the burden to allege facts that affirmatively show the trial court has subject matter jurisdiction. *See Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993). A respondent may assert in the plea that another court has exclusive jurisdiction or that the petitioner has made fraudulent allegations for the purpose of conferring jurisdiction. *See* Michol O'Connor, O'Connor's TEXAS RULES ˟ CIVIL TRIALS 2002, *Commentaries* 175, 176–77 (2002). Subject matter jurisdiction presents a question of law which we review *de novo. Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999). In deciding whether to grant or deny a plea to the jurisdiction, the court need not look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Bland ISD v. Blue,* 34 S.W.3d 547, 555 (Tex.2000). Where the pleadings do not affirmatively demonstrate an absence of jurisdiction, a liberal construction of the pleadings in favor of jurisdiction is appropriate. *Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996); *Peek v. Equipment Service Co. of San Antonio,* 779 S.W.2d 802, 804 (Tex.1989).

## UNIFORM CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT

 In her first issue for review, Kristen contends that the trial court lacked subject matter jurisdiction to make an initial child custody determination. Generally, there are three jurisdictional elements: (1) jurisdiction over the subject matter; (2) jurisdiction over the person or *res;* and (3) power to render the particular relief awarded. *City of El Paso v. Madero Development,* 803 S.W.2d 396, 399 (Tex. App.-El Paso 1991, writ denied), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992). Subject matter jurisdiction is essential to the authority of a court to decide a case; it is never presumed and cannot be waived. *Tex. Ass'n of Business,* 852 S.W.2d at 446.

 Jurisdiction here is predicated upon the UCCJEA which Texas adopted effective September 1, 1999. The Act was designed to address the "inconsistency of interpretation of the [former] UCCJA and the technicalities of applying the PKPA." [1] *McGuire v. McGuire,* 18 S.W.3d 801, 806 (Tex.App.-El Paso 2000, no pet.), *citing* Sampson & Tindall, TEXAS FAMILY CODE ANNOTATED § 152.001, *Introductory Comment,* p. 410 (1999). The new act prioritizes home state jurisdiction. Sampson & Tindall, TEXAS FAMILY CODE ANNOTATED § 152.001, *Commissioners' Official Prefatory Note to UCCJEA* p. 464 (2001). The clear purpose of the UCCJEA, like that of the former UCCJA, is to discourage and eliminate child snatching, to avoid jurisdictional competition, to avoid continued relitigation of custody decisions, and to promote cooperation between the states to ensure that a custody decision is rendered in the state that can better determine the best interest of the child.

### Home State

 "Home state" is defined in the Act:

1. "PKPA" is the acronym for the Parental Kidnaping Prevention Act of 1980, 28 U.S.C.A. § 1738A (West 2002). Although the PKPA prioritized "home state" jurisdiction, the former UCCJA as adopted by the National Conference of Commissioners on Uniform State Law authorized four independent jurisdictional bases without prioritization. The Texas version of the former Act prioritized home state jurisdiction. *See* former TEX.FAM. CODE ANN. § 152.003 (Vernon 1996).

(7) 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with a parent or a person acting as a parent. A period of temporary absence of a parent or a person acting as a parent is part of the period.

TEX.FAM.CODE ANN. § 152.102(7)(Vernon Supp.2002). In turn, "commencement" as used in the definition "means the filing of the first pleading in a proceeding." TEX. FAM.CODE ANN. § 152.102(5). Commentary suggests that although the definition of "home state" has been reworded slightly, no substantive change from the UCCJA was intended. Sampson & Tindall, TEXAS FAMILY CODE ANNOTATED § 152.102, *Commissioners' Comment* p. 470 (2001).

Section 152.201 provides the hierarchy for determining whether a state has jurisdiction to make an initial child custody determination:

## § 152.201. Initial Child Custody Jurisdiction

(a) Except as otherwise provided in Section 152.204, a court of this state has jurisdiction to make an initial child custody determination only if:

(1) this state is the home state of the child on the date of the commencement of the proceeding,[2] or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under Subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 152.207 or 152.208, and:

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under Subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 152.207 or 152.208; or

(4) no court of any other state would have jurisdiction under the criteria specified in Subdivision (1), (2), or (3).

TEX.FAM.CODE ANN. § 152.201. For our purposes, the commentary is again insightful:

The six-month extended home state provision of Subsection (a)(1) has been modified slightly from the UCCJA. The UCCJA provided that home state jurisdiction continued for six months when the child had been removed by a person seeking the child's custody or for other reasons and a parent or a person acting as a parent continues to reside in the home state. Under this Act, it is no longer necessary to determine why the child has been removed. The only inquiry relates to the status of the person left behind. This change provides a

---

**2.** One court has concluded that the "date of commencement of the proceeding" means the date of commencement of a proceeding in a

Texas court. *In re McCoy*, 52 S.W.3d 297, 306 (Tex.App.-Corpus Christi 2001, orig. proceeding).

slightly more refined home state standard than the UCCJA or the PKPA, which also requires a determination that the child has been removed 'by a contestant or for other reasons.'

Sampson & Tindall, TEXAS FAMILY CODE ANNOTATED § 152.201, *Commissioners' Comment* p. 478 (2001).

### Framing the Issue

Both parties agree that Texas was not Kaylee's home state as she had not resided here for the requisite six month period. Kristen contends that Massachusetts has home state status because her 45–day residence in Texas was merely a "temporary absence" as that term is used in Section 152.102(7). Regi contends that Kristen "moved" from Massachusetts to Texas so that no parent continued to live in Massachusetts; consequently, neither Texas nor Massachusetts has home state jurisdiction and Texas may assert "significant connections" jurisdiction under Section 152.201(a)(2)(A). We must first consider the meaning of "temporary absence."

### Temporary Absence

Kristen claims that she is not and never was a resident of the State of Texas, nor was their daughter. She contends that a temporary absence from the home state does not constitute new residency when the stay is less than six months. We begin with a review of five relevant decisions which have addressed the issue, starting with *Huffstutlar v. Koons*, 789 S.W.2d 707 (Tex.App.-Dallas 1990, orig. proceeding), to which Kristen directs our attention. The Huffstutlars were divorced in Texas in 1982 and Lynette was appointed the managing conservator of Kimberly. Lynette

and Kimberly moved to Oklahoma shortly after the divorce. On September 26, 1986, Larry went to Oklahoma and picked up Kimberly, although the parties told drastically different stories as to the reason why; Lynette claimed Larry abducted the child while Larry claimed Lynette had called him and asked him to take Kimberly. On October 8, 1986, Larry filed a motion to modify custody. Lynette appeared at a hearing on October 16, and the parties agreed to a continuance pending a home study, with Kimberly remaining with Larry in the interim. On December 23, Lynette took Kimberly back to Oklahoma.[3] She later moved with the child to Arizona without telling Larry where they had gone. Ultimately, on January 5, 1987, Judge Koons modified the decree and appointed Larry managing conservator of the child.[4] Lynette was arrested in Arizona on March 14, 1989 on a fugitive warrant for interfering with a child custody order. She was returned to Texas. On August 9, 1989, she filed an application for writ of habeas corpus contending that the modification order was void and that she was entitled to possession of Kimberly by virtue of the original decree of divorce. The trial court denied habeas relief, finding that although Oklahoma had been the home state of the child, the residence was terminated when Lynette voluntarily sent the child back to Texas with Larry. It further found that Texas had become the home state of the child by virtue of voluntary abandonment of home state jurisdiction in Oklahoma. Lynette sought a writ of mandamus. The court of appeals granted relief, concluding that the trial court lacked subject matter jurisdiction because voluntary abandonment of home state status was not a prop-

---

3. She later testified that since she had heard nothing further from the court concerning the motion to modify, she thought it was over and she was allowed to take the child.

4. Lynette claimed the hearing was unscheduled and occurred without notice to her. Consequently, she did not appear.

er basis for determining Kimberly's home state under Texas law and Texas had not become Kimberly's home state since she had not lived here the requisite time. *Huffstutlar*, 789 S.W.2d at 711. We find it noteworthy that in *Huffstutlar*, Lynette continued to reside in Oklahoma.

Proceeding with our analysis of these decisions in chronological order, we turn next to *Koester v. Montgomery*, 886 S.W.2d 432 (Tex.App.-Houston [1st Dist.] 1994, orig. proceeding). In 1985, the Koesters met in Venezuela, married in Texas, and then returned to Venezuela to live. Their two children were born there. During the marriage, the family traveled frequently between their home in Venezuela and Houston, Texas. By August 1993, problems had developed and Lisa moved with the children to Texas. Paul followed and the couple tried to work out their differences. In October 1993, however, Paul filed suit for divorce in Venezuela without Lisa's knowledge. On November 5, 1993, the court there entered an order granting temporary custody of the children to Paul. Despite the lawsuit, Paul, Lisa, and the children remained in Texas. In December 1993, Lisa returned to Venezuela briefly while the children remained in Texas with Paul. She learned of the divorce action for the first time when an attempt was made to serve her with process at the Venezuelan airport. During this time frame, Paul took the children and went back to Venezuela; Lisa returned to Texas and filed for divorce in January 1994. Paul filed a plea in abatement in the Texas action, alleging the pendency of the Venezuelan suit. He argued that under the former UCCJA, the home state of the children was Venezuela. He sought man-

damus relief when the trial court denied the plea in abatement. Finding first that the UCCJA applied internationally,[5] the appellate court determined that the Act did not apply to the Venezuelan proceeding because the Venezuelan court did not provide Lisa with reasonable notice and an opportunity to be heard. *Koester*, 886 S.W.2d at 434–35. The court further noted, however, that Venezuela could not exercise home state jurisdiction because at the time the Venezuelan suit was filed, both parents were living in Texas. "In fact, the evidence shows that both Paul and Lisa lived in Texas from August 1993 until December of 1993, when Paul took the children and returned to Venezuela." *Id.* at 435. Evidently, this four-month residence did not qualify as a "temporary absence." Although Venezuela had been the children's home state within six months before the suit was filed there, the children had been removed from Venezuela by their mother. *Id.* at 435. And while Texas did not qualify as home state because the children had not lived here for the six-month period immediately preceding the filing of the Texas divorce action, Texas could exercise jurisdiction based on significant connections. *Id.* This case appears to us to be the closest analogy to the case at bar. Nevertheless, we continue our analysis with *Lemley v. Miller*, 932 S.W.2d 284 (Tex.App.-Austin 1996, no writ).

The Millers were divorced in Oklahoma in February 1993, with the mother named as managing conservator of the child. She married shortly after the divorce, taking her new husband's surname of Lemley. In March 1993, the Lemley family moved to Texas. From January November 1995,

---

**5.** The UCCJA provided for international application if reasonable notice and opportunity to be heard were given to all affected parties. *See* former TEX.FAM.CODE ANN. § 11.73, *recodi-* *fied* at § 152.023. This concept is carried forward in the UCCJEA. *See* TEX.FAM.CODE ANN. § 152.105(a).

the family resided in Germany because of Mr. Lemley's active military duty. Thereafter, Mrs. Lemley returned to Texas and on December 7, 1995, she filed suit to modify visitation. Miller continued to reside in Oklahoma. Mrs. Lemley argued that Texas had jurisdiction because the child had lived in Bell County for six months prior to moving to Germany, that the residence in Germany was a temporary absence necessitated by her husband's active military duty, and that she and the child had returned directly to Texas from Germany. The trial court dismissed the suit and Mrs. Lemley appealed. In reversing, the appellate court noted that the time in Germany constituted a temporary absence from the state such that it was considered time that Mrs. Lemley and the child had resided in Texas for purposes of establishing home state jurisdiction. *Lemley*, 932 S.W.2d at 287. We have previously declined to follow *Lemley* which we found to have improperly analyzed jurisdiction solely under former Section 152.003(a), without reference to either former Section 152.014 or the PKPA. *See Coots v. Leonard*, 959 S.W.2d 299, 305 (Tex.App.-El Paso 1997, no pet.). This criticism stemmed from the court's decision that Texas could modify visitation provisions of the Oklahoma order. *Coots*, of course, was decided under the former UCCJA. Its application in UCCJEA proceedings is doubtful. *See McGuire v. McGuire*, 18 S.W.3d 801, 806 (Tex.App.-El Paso 2000, no pet.)(case law construing former Act regarding continuing jurisdiction will have little, if any, application under the new Act).

*Lemley* played a role in the case of *In re Jeffries*, 979 S.W.2d 429 (Tex.App.-Waco 1998, orig. proceeding). Jeffries and Pennington were divorced in Florida in 1991 with Jeffries named as the custodial parent. In April 1994, she moved to Georgia and entered into a common-law marriage.

In June 1997, after discovering that her current husband had sexually abused her daughter, Jeffries fled to Texas, arriving on August 7. The child was enrolled in school and Jeffries sought employment. Within a week, the Texas Department of Protective and Regulatory Services had filed suit to terminate the child's parental rights. At the time suit was filed, Pennington was also residing in Texas. In January 1998, Jeffries returned to Florida. The trial court ultimately determined that the child's home state was Georgia and that Texas could exercise emergency jurisdiction under former Section 152.003(a)(3)(B) of the Family Code. Georgia ultimately declined jurisdiction. In large part, the *Jeffries* decision analyzes the emergency jurisdiction provisions of the former UCCJA. It does address, however, the Department's contention that Texas was the child's home state because Jeffries intended to make a home in Texas, enrolled her daughter in school, and sought employment. Noting first that Texas could not become home state until the child had resided here for six months, the court then addressed the Department's contention that Georgia could not be the child's home state since she had not resided there immediately preceding the time suit was filed. Citing *Lemley*, the appellate court concluded that Jeffries and the child had resided in Texas only a week when suit was filed and that this brief absence from Georgia was a "temporary absence" as provided by statute. We find this reasoning flawed for two reasons. First, in *Lemley*, the time spent in Germany was attributable to Mr. Lemley's active military duty. In other contexts, the Family Code contemplates that time spent by a Texas domiciliary outside Texas while in the service of the armed forces is considered residence in Texas. *See* Tex.Fam. Code Ann. § 6.303 (Vernon 1998). Al-

though the UCCJEA does not contain a similar provision, logic at least supports a conclusion that military absence is a temporary absence. Second, in *Lemley,* the mother and children had left Texas for Germany and then returned to Texas; they were residing in Texas at the time suit was filed. Here, Jeffries left Georgia for Texas and although she resided in Texas at the time suit was filed, she had been here for one week. Within five months, she had left Texas, but she did not return to Georgia—she moved back to Florida. We are hard-pressed to see how the absence from Georgia could have been temporary when she never returned. It would appear to us that the child had no home state; she had only lived in Texas for one week, no one was living in Florida at the time suit was filed, and no one lived in Georgia at the time suit was filed or thereafter.

Finally we come to *In re McCoy,* 52 S.W.3d 297 (Tex.App.-Corpus Christi 2001, orig. proceeding). The McCoys lived most of their married life in Texas but moved to Qatar in 1996 to accommodate Michael's work as a petroleum engineer. Michelle and the children moved to Arkansas in October 1999; Michelle filed suit for divorce shortly thereafter. That same month, Michael filed suit in Qatar. In October 2000, the Qatar court entered a divorce decree but deferred ruling on child custody matters on the grounds that Texas was a more appropriate forum. Michael filed suit in Texas on February 2001, seeking custody of the children, a division of marital property, and recognition of the Qatar divorce decree. Michelle filed a motion to dismiss for want of jurisdiction. When her motion was denied by the trial court, Michelle sought mandamus relief.

In granting relief pursuant to the UCCJEA, the appellate court noted that Texas was not the home state of the children at the time suit was filed in Texas; in fact, the children had not lived in Texas since 1996. Because the children had been living in Arkansas with their mother for over a year at the time the Texas suit was filed, Arkansas was their home state. *Id.* at 303. The court next considered whether Texas would have jurisdiction under Section 152.201(a)(2)(allowing Texas to exercise jurisdiction if no other state had "home state" jurisdiction or if a court of the home state had declined to exercise jurisdiction on the ground that Texas was the more appropriate forum and if there were evidence of "significant connections"). Although Qatar was the home state of the children at the time the divorce suit was filed there and at the time suit was filed in Arkansas, it was not the home state at the time suit was filed in Texas. "[T]he operative date for determining whether *Texas* has jurisdiction is the date suit was filed *in Texas.*" [Emphasis in original]. *Id.* at 304. As for the Qatari court's deferral to Texas, Qatar could only defer home state status to Texas if it did so before Arkansas became the children's home state.

We are faced here with a situation in which Kristen moved from Massachusetts to Texas. Had she returned to Massachusetts before suit was filed, we might be more inclined to find her absence temporary. But at the time suit was filed in Texas, no one lived in Massachusetts— Kristen, Regi, and Kaylee were all living in Texas. Although Kristen and Kaylee returned to Massachusetts, Kristen was restrained from removing the child from El Paso County. She did so anyway.[6] The

---

**6.** In effect, this case presents the reverse of the scenario envisioned by Section 152.208 which, generally speaking, requires a court to decline jurisdiction when the court has acquired jurisdiction under the UCCJEA because a person seeking to invoke its jurisdic-

UCCJEA was designed to prevent the gamesmanship and forum shopping that has occurred here. Kristen chose to relocate to Texas and although, regrettably, she did not wish to remain, she cannot bootstrap her relocation to a "temporary absence" from Massachusetts by skipping town with the child in direct violation of a court order. Consequently, neither Texas nor Massachusetts had home state jurisdiction.

Kristen argues that Massachusetts has already determined it has home state status and has expressed its intent to exercise jurisdiction. By letter dated August 15, 2000, a judge of the Probate and Family Court Department, Norfolk Division, advised the associate judge below as follows:

> Given the facts set forth in Ms. Fox's Affidavit, which in pertinent part are essentially undisputed, it would appear that Massachusetts and not Texas is the child's home state under the UCCJA. Massachusetts was the child's home state within six months of the date(s) upon which the actions were filed in each court. It would, therefore, appear that the fact that the mother and child resided briefly in Texas (June July 2000) would not confer subject matter jurisdiction in Texas. Moreover, the child was born in Massachusetts, and mother and the child currently reside in, and have significant lifelong connections to, Massachusetts.

> After reviewing the enclosed, and your, [sic] file, I respectfully submit that for the reasons set forth above, you decline to take further action and dismiss the action pending before you in order that any question of subject matter jurisdiction can be put to rest.

Without question, the Texas proceeding was filed first, and it was filed at a time when all parties resided in Texas. Thus, the provisions of Section 152.206(a) are inapplicable. TEX.FAM.CODE ANN. § 152.206(a)(a court of this state may not exercise its jurisdiction under the UCJEA if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been commenced in a court of another state). Nor can we conclude that Section 152.206(b) applies (if a Texas court determines that a child custody proceeding has been commenced in another state having jurisdiction substantially in accordance with the Act, the Texas court shall stay its proceeding and communicate with the court of the other state; if the court of the state having jurisdiction substantially in accordance with this chapter does not determine that the Texas court is a more appropriate forum, the Texas court shall dismiss the proceeding). As we have detailed, Massachusetts was not Kaylee's home state.

We must next consider whether it was appropriate for Texas to exercise jurisdiction on the basis of significant connections. This necessitates a showing by Regi that (1) the child has no home state or the home state has declined to exercise jurisdiction; (2) it is in the best interest of the child because the child and at least one of its parents have a significant connection with Texas beyond mere physical presence; and (3) there is available in Texas substantial evidence concerning the child's present or future care, protection, training, and personal relationships. TEX.FAM.CODE ANN. § 152.201(a)(2).

### *Significant Connections*

At the hearing, Regi and his father testified concerning Kaylee's connections to

tion has engaged in unjustifiable conduct. *See* TEX.FAM.CODE ANN. § 152.208(a). Here, Kristen attempted to avoid jurisdiction in Tex-

as by fleeing the state after being served with a restraining order.

Texas. Bruce Brilliant testified that he has lived in El Paso since 1975 and is employed with United States Customs. He has seven other children besides Regi, five of whom still live at home. These four girls and one boy range from two to eleven years of age. The extended family saw Kaylee on a frequent basis and the children would play together. His home featured "a great big play room and there's nothing but toys." Kaylee had a place in their family and "[s]he loved it there." He also explained Regi's and Kristen's plans to raise their family in Texas:

> [T]hey were going to go ahead and go get a house. As a matter of fact, I had the ticket to bring her down here. And after that, she was going to get a job. And my wife even said I'll go over, pick up the baby, take you to work, bring the baby to the house and the baby can play with the kids all day long.
> Q: Was that acceptable to Kristen?
> A: Yes.

As the father of eight children, he had helped Kristen with child care, teaching her that she could not mix the formula with plain tap water, that she needed to sterilize the bottles, boil the water and the nipples. He had warned her that if she preferred to use the microwave, she should not put the nipples in it.

Regi testified that Kaylee's medical records were transferred to Texas and that the child was behind in her immunizations. He brought her current "except for the TB. She had an appointment for the 14th, but she wasn't here." The Social Security Administration was advised that Kaylee's residence was in Texas.

As we have noted, Kristen did not appear at the hearing so the record contains only the affidavit attached to her plea to the jurisdiction. In it, she claimed that Regi obtained the temporary restraining order by making fraudulent representa-

tions to the court. She also alleged that he had made misrepresentations to her concerning "life in his home state of Texas." The affidavit does not specify what those misrepresentations were, nor did Kristen offer evidence to establish any. With regard to significant connections, she made the following statements without elaboration:

- I have lived in Quincy, Massachusetts all of my life and was living in Quincy when I met Reginald Brilliant.

. . .

- I was 17 years old when I became pregnant and was living at home with my mother in Quincy, Massachusetts.
- When I was six months pregnant, Reginald Brilliant and I moved in together.
- We lived together at 81 Island Street, Marshfield, Massachusetts for approximately one year and four months.

. . .

- I always had reservations about making such a drastic move with my young baby as I had always been extremely close to my mother; and my ties in Massachusetts, where I had lived all of my life, were very strong.

. . .

- I intend to stay in the Commonwealth of Massachusetts permanently.
- I have been the sole caretaker of my daughter, Kaylee, since her birth.
- Kaylee has become extremely attached to my mother, Lynn Fox, with whom we both live.

Kaylee lived with both of her parents from the time of her birth until April 15, 2000 and again from June 12, 2000 until July 24, 2000. She lived with her mother and her maternal grandmother from mid-April un-

til June 12, 2000.[7] Lynn Fox did not testify in person or by affidavit. There was no evidence presented concerning the environment in Massachusetts, other than that Kaylee's medical care had been neglected. Certainly, evidence of Kaylee's connections to Massachusetts could have been presented but Kristen, electing not to appear, offered nothing more than conclusory comments about her attachments to Massachusetts and her mother, and Kaylee's attachment to her grandmother. We are disinclined to accord much weight to attachments Kaylee may have developed in the months following her return to Massachusetts in July 2000 when the move was in complete and utter disregard of a court order. Moreover, jurisdiction is determined based upon the existing circumstances at the time suit is filed in Texas. We thus conclude that it was in Kaylee's best interest for Texas to assume jurisdiction because she and her father had a significant connection to Texas other than mere physical presence, and, based on the record before us, Texas was a repository of substantial evidence concerning her present or future care, training, and personal relationships. Consequently, Texas was authorized to exercise its jurisdiction based on significant connections. Kristen's first issue for review is overruled.

## DEFAULT JUDGMENT

■ On the day after the trial court denied the motion for new trial, Regi and his attorney appeared and obtained a default judgment which appointed Regi as the sole managing conservator of Kaylee. Kristen contends that she had entered an "appearance" such that she was entitled to notice of the hearing. Regi urges us to construe the trial court's order as a judgment *nihil dicit.*

---

7. Although she was again living with her mother and maternal grandmother from July 24 forward, we determine jurisdiction based

■ The Supreme Court has discussed three types of default judgments that contrast to "a judgment upon trial." *Stoner v. Thompson,* 578 S.W.2d 679, 682 (Tex.1979). The first is the traditional no-answer default. Second is the judgment *nihil dicit,* which occurs when a defendant has (1) entered some plea, usually of a dilatory nature, but one which does not place the merits of the plaintiff's case in issue; or (2) withdrawn his answer. *Frymire Engineering Co. v. Grantham,* 524 S.W.2d 680, 681 (Tex.1975)(per curiam). A no-answer default and a judgment *nihil dicit* are so similar that the same rules apply to each with respect to the effect and validity of the judgment. *See Stoner,* 578 S.W.2d at 682.

■ A judgment *nihil dicit* is proper when a party appears but has filed no answer on the merits. *O'Quinn v. Tate,* 187 S.W.2d 241, 245 (Tex.Civ.App.-Texarkana 1945, no writ). It is stronger than a no-answer default in that a judgment *nihil dicit* acts as a confession of judgment. *Gomperts v. Wendeborn,* 427 S.W.2d 904, 905 (Tex.Civ.App.-Austin 1968, no writ). These two types of judgments contrast with a post-answer default judgment, in which an answer is on file but the defendant fails to appear at trial. The difference is that a post-answer default constitutes neither an abandonment of the answer nor an implied confession of any issues joined by the answer. A judgment cannot be entered on the pleadings; the plaintiff must offer evidence and prove his case as in a judgment upon a trial. *See Stoner,* 578 S.W.2d at 682.

At oral argument, Regi conceded that none of the cases involving judgments *nihil dicit* to which he has directed our attention involved a suit affecting the par-

---

upon the circumstances as they existed on the date suit was filed.

ent-child relationship in which the trial court was charged with determining a child's best interest. Moreover, none of the cases which he cites addresses whether a judgment *nihil dicit* may be taken without notice. Even the *Texas Quarries* case, which Regi suggests is factually similar, reveals that a notice of the trial setting was provided. *See Texas Quarries v. Pierce,* 244 S.W.2d 571, 572 (Tex.Civ.App.-San Antonio 1951, no writ).

■ An original answer may consist of motions to transfer venue, pleas to the jurisdiction, pleas in abatement, or any other dilatory pleas. Tex.R.Civ.P. 85. If a timely answer has been filed, or the respondent has otherwise made an appearance in a contested case, she is entitled to notice of the trial setting as a matter of due process. *Peralta v. Heights Medical Center, Inc.,* 485 U.S. 80, 84–86, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988); *Gonzalez v. State,* 832 S.W.2d 706, 707 (Tex.App.-Corpus Christi 1992, no writ); *Langdale v. Villamil,* 813 S.W.2d 187, 190–91 (Tex. App.-Houston [14th Dist.] 1991, no writ). Even a *pro se* answer in the form of a signed letter that identifies the parties, the case, and the defendant's current address, constitutes a sufficient appearance to require notice to that party of any subsequent proceedings. *Smith v. Lippmann,* 826 S.W.2d 137, 138 (Tex.1992).

■ Kristen's plea to the jurisdiction constituted an appearance. *Martinec v. Maneri,* 494 S.W.2d 954, 955 (Tex.Civ. App.-San Antonio 1973, no writ). When a party has appeared, she is entitled to notice of trial pursuant to Rule 245. *Blanco v. Bolanos,* 20 S.W.3d 809, 811 (Tex.App.-El Paso 2000); *Turner v. Ward,* 910 S.W.2d 500, 505 (Tex.App.-El Paso 1994, no writ). The rule provides that the "[c]ourt may set contested cases on written request of any party ... with reasonable notice of not less than forty-five days to the parties of a first setting for trial...."

Tex.R.Civ.P. 245. A trial court's failure to comply with the rules of notice in a contested case deprives a party of the constitutional right to be present at the hearing, to voice her objections in an appropriate manner, and results in a violation of fundamental due process. *Platt v. Platt,* 991 S.W.2d 481, 483 (Tex.App.-Tyler 1999, no pet.). Thus, if the respondent does not have notice of the trial setting as required by Rule 245, the default judgment should be set aside because it is ineffectual. *Id.* at 484. We sustain the second issue for review. The judgment is reversed and remanded for trial on the merits.